# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 19-CR-4088-LTS-KEM |
| vs. | **REPORT AND RECOMMENDATION** |
| MONEE YODPRASIT, | |
| Defendant. | |

_____

A package mailed to Defendant Monee Yodprasit's residence in Sioux City, Iowa, was supposed to arrive on Saturday, November 2, 2019. The day before its scheduled arrival, however, postal workers diverted the package from Sioux City to the Des Moines, Iowa area to subject the package to a drug-dog sniff. The dog sniff (and positive alert) ultimately occurred on Tuesday, November 5, 2019, and the search of the package occurred the next day. Yodprasit moves to suppress evidence stemming from the search of the package, challenging the existence of reasonable suspicion to detain the package and the reasonableness of the delay between its seizure and the dog sniff. Doc. 25-1. The Government resists, arguing (in part) that Yodprasit lacks standing to challenge the package's detention, as it was addressed to a fictitious person. Doc. 30. I recommend finding that Yodprasit had a legitimate expectation of privacy in the package (such that he may challenge its detention) and **denying** his motion to suppress (Doc. 25) on the merits.

## I.  BACKGROUND

In October 2019, Postal Inspector Ryan Brandt began investigating suspicious packages being mailed to a particular address in Sioux City. He first started to look into the address after seeing it appear multiple times on daily reports he receives to assist him

in identifying packages containing narcotics, which list all packages mailed to Iowa from California, paid for in cash, and of a certain weight. After investigating further, Inspector Brandt believed that the packages were sent from fictitious businesses, so he initiated a mail watch on the Sioux City address to be alerted of any packages sent to the address.

On October 23, 2019, Inspector Brandt learned that a package had been mailed from Temple City, California, to the Sioux City address. He alerted Drug Enforcement Agency (DEA) Task Force Officer Alex O'Dell, who conducted surveillance of the address on October 25, 2019, the date the package was delivered. Officer O'Dell observed the postal worker hand the package to Yodprasit for delivery, after which Yodprasit took the package inside the house. Officer O'Dell conducted surveillance on the house on other occasions in October 2019, and he observed Yodprasit coming and going from the house on multiple occasions, as well as other family members. Inspector Brandt learned from Officer O'Dell that the Yodprasit family was associated with the address.

On Wednesday, October 30, 2019, another package was sent to the Sioux City address from California, with an estimated arrival date of Saturday, November 2, 2019. On October 31, 2019 (prior to the package's arrival in Sioux City), Inspector Brandt ordered postal workers in Sioux City to forward the package to his office in Urbandale, Iowa, (in the Des Moines area) once it arrived in Sioux City. Inspector Brandt believed that he had reasonable suspicion to divert the package after reviewing a photo of the package taken by mail-sorting equipment in California.

The package arrived by plane in Sioux Falls, South Dakota, on the morning of Friday, November 1, 2019, and was transported by truck to Sioux City that same day (a little more than an hour's distance). When postal workers in Sioux City received the package, they did not scan it, so anyone with the package's tracking number would not have seen that the package had arrived in Sioux City. Postal workers sent the package to Inspector Brandt as instructed. The package was in transit to Des Moines on Saturday, November 2 (which is about a three-hour drive from Sioux City); it did not move on

Sunday, November 3, as most packages are not delivered on Sundays and few postal workers work; and the package arrived in Inspector Brandt's office in Urbandale around midday on Monday, November 4. When Inspector Brandt examined the package in person, he observed spray foam leaking out of the package, which he knew to be used by drug traffickers to mask the smell of drugs. He contacted the Des Moines Police Department to arrange for a K-9 to sniff the package. The drug-dog sniff occurred the next day, Tuesday, November 5, at around 2:15 p.m. *See* Doc. 42-1 at 5. The dog positively alerted to the presence of drugs in the package. On Wednesday, November 6, Inspector Brandt applied for and received a search warrant for the package. *See* Doc. 42. When he opened the package, he confirmed it contained drugs (specifically, methamphetamine). On Friday, November 8, Inspector Brandt received a second search warrant, this time for the Sioux City house, based on the methamphetamine found in the seized package and the similar packages that had been delivered to the house in the past. *See* Doc. 42-1. Officers searched the Sioux City house that same day and discovered cocaine, methamphetamine, heroin, firearms, and $24,000 cash. Officers arrested Yodprasit, and the seized package was never delivered.

Yodprasit moved to suppress evidence seized during the search of his residence, arguing that it is a fruit of the unlawful seizure of his package. Doc. 25.[1] He argued that Inspector Brandt lacked reasonable suspicion to divert the package and that even if the seizure was reasonable at its inception, it became unreasonable due to delay. The Government resisted, arguing that Yodprasit lacked standing to challenge the seizure of the package and that the seizure was reasonable. Doc. 30.

I held a hearing on the motion on January 24, 2020, at which Inspector Brandt and Yodprasit testified. Doc. 38. I also admitted three Government exhibits into evidence: Exhibit 1, the first search warrant (Doc. 42); Exhibit 2, the second search warrant (Doc.

---

[1] He confirmed at the hearing that he is not challenging the existence of probable cause in the warrants independent of the seizure of the package.

42-1); and Exhibit 3, a picture of the package taken by Inspector Brandt at his office in Urbandale (Doc. 42-2).[2] At the conclusion of the hearing, the parties disputed when the initial seizure of the package occurred, and I invited them to file additional briefs on this issue and any other.[3] Yodprasit filed a post-hearing brief (Doc. 45), and the Government filed a brief in response (Doc. 46).

At the suppression hearing, Inspector Brandt initially testified that when he diverted the package, the following facts gave him reasonable suspicion that the package contained drugs: the package was mailed from California, a drug-source state; the package was heavily taped;[4] the package was sent via three-day priority mail (he testified that drugs are often sent via express or priority mail, the first of which is overnight and the latter of which takes two to three days); the name of the recipient of the package, "Johnathan Lee," was not associated with the Sioux City address; the sender of the package, "LAJR Logistics," appeared to be a fictitious company, as it was not associated with the residential address used as the return address, and it did not appear on the California Secretary of State website; and prior mailings to the Sioux City address fit the same profile. There were sixteen prior packages fitting the same profile sent to the Sioux City address previously, about three a month beginning in June 2019 (this information is included in the second search warrant, but it is unclear whether Inspector Brandt

---

[2] Government Exhibit 3 admitted at the hearing was also submitted as "Attachment 1" to the Government's resistance. Doc. 30-1.

[3] The parties' briefs did not address the issue of when the seizure occurred. *See* Doc. 25-1 at 3 (noting "[s]eizure occurs when a package is removed from its ordinary progress in the mail and is diverted for further investigation" and arguing that "the parcel . . . was diverted at Sioux Falls"); Doc. 30 at 13-14 (noting defendant "claims the diversion of the package from its ordinary progress in the U.S. mail is a seizure," and analyzing reasonable suspicion based on facts known "before [Inspector Brandt] requested the parcel be diverted"). When I asked at the hearing whether the parties agreed that the seizure occurred on November 1, when the package was diverted from Sioux City to Urbandale, both sides disagreed and raised their current arguments.

[4] I credit Inspector Brandt's testimony that based on his training and experience, the taping at the seams of the package constituted "heavy" taping.

4

confirmed the precise details of the prior mailings before ordering diversion, or whether he relied on his general memory of the past suspicious mailings). Doc. 42-1 at 6. The prior suspicious mailings used names not associated with the Sioux City address, including "Jonathan Lee" (as opposed to "Johnathan Lee"), "John Lee," "Jimmy Lee," and "Michael Lopez," and the return address on the prior packages listed "Knight Incorporated" or "LAJR Logistics," companies Inspector Brandt believed were fictitious. *See also id*. Inspector Brandt could not remember which names were used on the package delivered to Yodprasit on October 25.

Inspector Brandt testified on cross-examination that although he believed LAJR Logistics to be a fictitious company prior to ordering the package's diversion, he did not look up the company's information on the California Secretary of State website until after the execution of the search warrant of the package. He added that most legitimate companies have an account with the post office; they do not fold up a printed piece of paper as a label and mail packages from the counter at the post office paying with cash, as was done here. Later in the hearing, Inspector Brandt testified again that he did not think he looked up LAJR Logistics on the California Secretary of State website until after the execution of the first search warrant, but he could not remember for certain. The first search warrant for the package includes the information about the California Secretary of State website (so Inspector Brandt misremembered the timing of when he looked at that website). Doc. 42-1 at 4.[5] It is unclear whether Inspector Brandt learned

---

[5] The first search warrant indicates that Inspector Brandt looked up the Secretary of State website information on November 5, 2019, the day of the drug-dog sniff (and after the package had already been diverted). Doc. 42 at 4. It also indicates that Inspector Brandt used the CLEAR database on that date, which showed that "LAJR Logistics" and "Johnathan Lee" were not associated with the addresses on the package (sender and recipient, respectively), but Inspector Brandt testified that he would have run that same CLEAR database search upon seeing the image of the package on the mail-sorter equipment (prior to the package's diversion) and then run the search again when completing his affidavit in support of the search warrant. Thus, just because the search warrant indicates Inspector Brandt used the Secretary of State website on November 5 does not mean that he had not looked up that information previously.

that the California Secretary of State website did not include information about "LAJR Logistics" prior to the package's diversion. Inspector Brandt also testified that he performed Google searches of "LAJR Logistics" and found no internet presence of the company, but he could not say for sure whether he conducted this search prior to ordering the diversion of the package. His testimony on the whole indicates that he was aware prior to ordering the package's diversion, however, that "LAJR Logistics" was not associated with the residential return address on the package.

## II. DISCUSSION

The resolution of Yodprasit's motion to suppress requires discussion of several issues: (1) whether Yodprasit had a legitimate expectation of privacy in the package, (2) the timing of the seizure of the package; (3) whether reasonable suspicion existed to seize the package; and (4) whether the delay between the seizure of the package and the drug-dog sniff rendered the seizure unreasonable. To the extent that the Government raised the applicability of the *Leon*[6] good-faith exception, I decline to address the issue, as I ultimately find that the seizure of the package comported with the Fourth Amendment.

### A. Legitimate Expectation of Privacy in the Package

As an initial matter, the Government argues that Yodprasit lacks standing to challenge the seizure of the package. "Fourth Amendment standing is 'useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched [or object seized] before seeking relief for an unconstitutional search [or seizure],' but it does not implicate Article III jurisdiction." ***United States v. Bettis***, 946 F.3d 1024, 1027 (8th Cir. 2020) (quoting ***Byrd v. United States***, 138 S. Ct. 1518, 1530 (2018)). "Fourth Amendment rights are personal and may not be vicariously

---

[6] ***United States v. Leon***, 468 U.S. 897 (1984).

6

asserted." *United States v. Douglas*, 744 F.3d 1065, 1071 (8th Cir. 2014) (cleaned up) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). A defendant may challenge an unreasonable search or seizure if the defendant "had a legitimate expectation of privacy in the area searched or the item seized." *Bettis*, 946 F.3d at 1027. A legitimate expectation of privacy requires both that the defendant "'asserted a subjective expectation of privacy' 'in the place searched or object seized,'" and that "his 'subjective expectation is objectively reasonable.'" *Douglas*, 744 F.3d at 1069. The defendant bears the burden of proving his legitimate expectation of privacy in the seized item. *See id.*

Here, Yodprasit testified at the suppression hearing that he was the intended recipient of the package.[7] He testified that after communicating with the sender of the package, he expected it to arrive on Friday, November 1, or Saturday, November 2, addressed to "Johnathan Lee." Further, although the package was addressed to a fictitious person, it used Yodprasit's real residential address (where he lived with several other members of his family). In addition, Yodprasit had accepted a similar package from the postal worker previously (on October 25) and taken it inside the house. I find that these factors combined establish Yodprasit's legitimate expectation of privacy in the package.

The Government argues that Yodprasit's expectation of privacy in the package was unreasonable given the use of a fictitious name. The Government relies on two cases, *United States v. Sesay*, 937 F.3d 1146 (8th Cir. 2019), *petition for cert. filed sub.*

---

[7] The Supreme Court has reasoned that it is "intolerable that one constitutional right"—the Fifth Amendment privilege against self-incrimination—"should have to be surrendered in order to assert another"—to establish the "proof of standing necessary to assert a Fourth Amendment claim." *Simmons v. United States*, 390 U.S. 377, 392-94 (1968). Thus, the Court has held "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id.* at 394; *see also, e.g.*, *United States v. Hardison*, 859 F.3d 585, 589-90 (8th Cir. 2017); *United States v. Mitchell*, No. CR 12-172, 2015 WL 5886198, at *2 (E.D. Pa. Oct. 7, 2015). I advised Defendant prior to testifying, however, that the admissibility of any testimony at trial will ultimately be a matter for the trial judge to decide.

7

*nom United States v. Samaan*, No. 19-7429 (U.S. Jan 27, 2020); and *United States v. Williams*, 349 F. Supp. 3d 1007 (D. Haw. 2018). The Government argues that *Sesay* stands for the proposition that Yodprasit, "as a third party according to the label on the parcel, does not have a legitimate expectation of privacy in the package." Doc. 30 at 11-12. I disagree. *Sesay* involved the search of a list of names on a hotel registry, and the Eighth Circuit held that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." 937 F.3d at 1152. *Sesay* did not involve whether a defendant had standing to challenge the seizure of a package, and it is irrelevant (especially as the Government recognizes that a person has a legitimate expectation of privacy in the mail).

In *Williams*, the court addressed the issue at hand (standing to challenge the seizure of a package), but I find that it is distinguishable. In that case, the court found that the defendant lacked standing to challenge the seizure of a package addressed to "Anne Langorio" when the defendant's name was "Chase Williams." 349 F. Supp. 3d at 1009-11. It was unclear whether the addressee was a fictitious or real person; the address on the package was a residence other than defendant's; and a third party (neither the addressee nor the defendant) accepted the package from the postal worker, said it was for his brother, and brought it inside, where it was opened shortly thereafter with both the third party and defendant present. *Id.* at 1011-13. Here, on the other hand, the package was addressed to a fictitious person at Yodprasit's residence, and although the package was never delivered, Yodprasit (not a third party) had taken possession of a similar package (including fictitious addressee) a week earlier from the mail carrier. In addition, although the court in *Williams* suggested that the "intended recipient" of a package lacks a Fourth Amendment privacy interest in the package, it does not appear that the *Williams* defendant offered any evidence that he was indeed the intended recipient—unlike Yodprasit, who testified here. *See id.* at 1012-13.

Most courts—including a judge in the Northern District of Iowa—have held that "a defendant has standing to object to the search of a package addressed to him" at his

8

residence "under a fictitious name or 'alter ego.'" *United States v. Sanchez*, No. CR98-4033-MWB, 1999 WL 33657684, at *1 (N.D. Iowa Feb. 23, 1999), *report and recommendation adopted*, No. 98-CR-4033-MWB, Doc. 31 (N.D. Iowa March 16, 1999), *aff'd,* 205 F.3d 1349 (8th Cir. 1999) (per curiam) (not addressing standing); *accord United States v. Garcia-Bercovich*, 582 F.3d 1234, 1238 (11th Cir. 2009) ("[A]n individual has a reasonable expectation of privacy in a package even if addressed to a fictitious name."); *United States v. Pitts*, 322 F.3d 449, 459 (7th Cir. 2003) ("[T]he expectation of privacy for a person using an alias in sending or receiving mail is one that society is prepared to recognize as reasonable."); *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992) ("[I]ndividuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names."); *United States v. Boyd*, No. CRIM.A. 05-10037-GAO, 2006 WL 314344, at *4 (D. Mass. Feb. 8, 2006) ("[A] person does not lose his privacy interest in a package if he is the intended recipient but chooses to use a fictitious name."), *aff'd,* 298 F. App'x 25 (1st Cir. 2008) (per curiam) (not addressing standing); *see also United States v. Terriques*, 211 F. Supp. 2d 1137, 1143-44 (D. Neb. 2002) (adopting report and recommendation) (holding that defendant had standing to challenge search and seizure of package when he identified himself to delivery person using the fictitious name on the package and "provided a photographic identification in support of that claim"), *aff'd,* 319 F.3d 1051 (8th Cir. 2003) (not addressing standing); *but see United States v. Lozano*, 623 F.3d 1055, 1064 (9th Cir. 2010) (O'Scannlain, J., concurring); *United States v. Walker*, 20 F. Supp. 2d 971, 973-74 (S.D. W. Va. 1998); *United States v. DiMaggio*, 744 F. Supp. 43, 46-47 (N.D.N.Y. 1990). In holding that it is reasonable to maintain an expectation of privacy in mail addressed to an alias, the Seventh Circuit reasoned:

> [T]here are a number of legitimate reasons that a person might wish to send or receive a package using a *nom de plume*. Some authors and journalists, such as the incomparable Ann Landers, whose real name was Eppie Lederer, employ a pseudonym in their professional life. This is a common and unremarkable practice. In other situations, a celebrity may

9

> wish to avoid harassment or intrusion; a government official may have security concerns in using her real name or home address to receive mail; a business executive in merger talks might worry about potential investors misusing the information gained through the mail to manipulate the securities markets. Indeed, a sender of mail might wish to remain completely anonymous for any number of reasons.

*Pitts*, 322 F.3d at 457-58 (citations omitted). The Seventh Circuit in *Pitts* rejected the argument that those "who employ an alias for illicit purposes" (but not those who "us[e] an alias for legitimate reasons") lose their expectation of privacy in mailings, noting that justifying the search after the fact based on the contents of the package containing illegal substances "turn[s] the Fourth Amendment on its head." *Id.* at 458-59.

I agree with the Seventh Circuit's reasoning. I note that courts that have held otherwise have not mentioned the legitimate reasons a person may wish to use an alias. Some have also relied on the defendant's inability to pick the package up from the post office if addressed to a fictitious person, but it appears from the United States Postal Service website that a third party can pick up another's mail that does not require a signature as long as the third party has the delivery notice signed by the addressee.[8] Here, I find that Yodprasit had a legitimate expectation of privacy in the package addressed to a fictitious person at his residence based on Yodprasit's testimony that the package was sent to him using a fictitious name and given that Yodprasit previously accepted a similar package from the postal worker. I recommend finding that Yodprasit can challenge the constitutionality of the search and seizure of the package.

### B. Timing of the Seizure

The parties agree that the package was seized, but they dispute the timing of the seizure. Yodprasit argues that the seizure occurred on Thursday, October 31, 2019, when Inspector Brandt ordered postal workers in Sioux City to divert the package to

---

[8] *See **Picking Up Mail that is Being Held at Your Post Office***, USPS (Aug. 21, 2019), https://faq.usps.com/s/article/Picking-Up-Mail-that-is-Being-Held-at-Your-Post-Office.

10

Urbandale once it arrived in Sioux City. The Government argues that the package was not seized until it failed to be delivered on the day of its scheduled arrival—Saturday, November 2, or later.

I disagree with both parties. "[A] seizure occurs . . . when [the government] 'meaningfully interfere[s]' with an individual's possessory interests in the property." *United States v. Zacher*, 465 F.3d 336, 338 (8th Cir. 2006) (third alteration in original) (quoting *United States v. Va Lerie*, 424 F.3d 694, 701, 706 (8th Cir. 2005) (en banc)). A meaningful interference is one that "delay[s] the timely delivery" of the package or "deprive[s] a carrier of its custody of the" package. *Id.* The defendant bears the burden of proving a seizure occurred. *See United States v. Carhee*, 27 F.3d 1493, 1496 & n.1 (10th Cir. 1994); *United States v. Steele*, 782 F. Supp. 1301, 1306 (S.D. Ind. 1992), *aff'd,* 989 F.2d 502 (7th Cir. 1993).

Delivery of the package was not impacted when Inspector Brandt told postal workers in Sioux City on October 31 to divert the package—at that time, the package was still in Sioux Falls, and it proceeded to Sioux City as it would have usually. On the other hand, the Government's argument (that a seizure of mail does not occur until the mail fails to arrive as scheduled) is contradicted by controlling Eighth Circuit caselaw. *See Zacher*, 465 F.3d at 338 (holding that "a seizure occurred when the police detained the package past 6:30 p.m." when "[t]he package was supposed to be delivered the next day, and FedEx had to send it out by 6:30 p.m. to meet that deadline"). It seems that when the package arrived in Sioux City on November 1 and Sioux City postal workers took action to divert the package to Urbandale, rather than deliver it to Yodprasit as scheduled (including by not scanning the package in for tracking purposes), they meaningfully interfered with Yodprasit's possessory interest in the package. At the very least, the package was seized by the morning of Saturday, November 1, when it was transported to Des Moines from Sioux City. *See id.*

### C. Reasonable Suspicion

"The Fourth Amendment's protection against unreasonable searches and seizures extends to packages placed in the mail." *United States v. Huerta*, 655 F.3d 806, 808 (8th Cir. 2011). "As such, a law enforcement officer may seize a package in the mail for investigative purposes only if he has reasonable suspicion that the package contains contraband." *Id.* "Reasonable suspicion exists when, based on the totality of the circumstances, an officer possesses a 'particularized and objective basis' for suspecting that the package contains contraband, that is, more than an 'inchoate and unparticularized suspicion or "hunch."'" *United States v. Johnson*, 171 F.3d 601, 603 (8th Cir. 1999) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). "[Courts] examine the totality of the circumstances arguably supporting a determination of reasonable suspicion, evaluating those circumstances as they would be 'understood by those versed in the field of law enforcement.'" *United States v. Demoss*, 279 F.3d 632, 636 (8th Cir. 2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). The government bears the burden of proving the existence of reasonable suspicion to support a warrantless seizure. *See United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003) (noting generally that government bears burden when search or seizure is without a warrant); *see also Carhee*, 27 F.3d at 1496 & n.2 (holding that "government must prove reasonable suspicion justifying warrantless seizure" of a briefcase (citing *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993))).

Here, Inspector Brandt's testimony establishes at the time of the seizure, he believed the package listed a fictitious company in the return address and a fictitious person as the addressee, since neither name was associated with their respective addresses (according to public records in the CLEAR database), and it is unusual for legitimate companies to send packages by cash with taped-on printed labels.[9] He also knew that

---

[9] I find that Inspector Brandt did not know the information from the California Secretary of State's website at the time of the seizure.

prior packages had been sent to the same address using similar fictitious names (such as a different first name with the last name Lee, or a variant of Johnathan with a different last name). He further knew that the package fit several characteristics common to packages containing drugs, namely, that it was mailed from California, a drug-source state; that it was heavily taped; and that it was sent via three-day priority mail. The Eighth Circuit has held on numerous occasions that the combination of these and similar factors give postal inspectors reasonable suspicion to seize a package to subject it to a drug-dog sniff. *See Huerta*, 655 F.3d at 809-10; *United States v. Lakoskey*, 462 F.3d 965, 976 (8th Cir. 2006); *United States v. Morones*, 355 F.3d 1108, 1110-12 (8th Cir. 2004); *United States v. Logan*, 362 F.3d 530, 533-34 (8th Cir. 2004); *United States v. Gomez*, 312 F.3d at 922, 924-25; *Demoss*, 279 F.3d at 636.

Defendant argues that there are innocent explanations for each of the factors identified by Inspector Brandt. "But '[c]haracteristics consistent with innocent use of the mail can, when taken together, give rise to reasonable suspicion.'" *Demoss*, 279 F.3d at 636 (alteration in original) (quoting *Johnson*, 171 F.3d at 605). I recommend finding that reasonable suspicion supported the initial seizure of the package.

### D. Reasonableness of Length of Seizure

A seizure of a package reasonable at its inception may, "by its 'nature and extent,'" become "an unreasonable intrusion upon [defendant's] legitimate privacy expectations." *Demoss*, 279 F.3d at 636 (quoting *United States v. Place*, 462 U.S. 696, 705 (1983)). In determining the reasonableness of the seizure, "the length of the detention must be considered in light of the amount of time reasonably required for a diligent inspector to complete an investigation into the package being held." *Gomez*, 312 F.3d at 925. The Eighth Circuit has declined to impose a bright-line rule on when a seizure becomes unreasonable due to delay, noting that the length of time needed to complete an investigation "will vary with each case." *Id.* Yodprasit argues that the four-day delay between the initial seizure of the package (which I have found occurred at the

13

earliest on Friday, November 1, 2019) and the drug-dog sniff on the afternoon of Tuesday, November 5, 2019, rendered the seizure unreasonable.[10]

The Eighth Circuit has never addressed the seizure of a package as long as the one here. *See United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015) (upholding three-and-a-half-hour seizure for drug-dog sniff); *Lakoskey*, 462 F.3d at 970-71, 977 (upholding one-day seizure when package arrived at its destination and a K-9 failed to alert; the package was sent to postal inspector's city, arriving the next day; and upon its arrival, the postal inspector conducted a drug-dog sniff in a closed compartment, resulting in a positive alert); *Demoss*, 279 F.3d at 636-37 (upholding twenty-minute seizure for arrival of K-9); *Gomez*, 312 F.3d at 922, 925-26 (upholding twelve- to fourteen-hour delay when seizure occurred in the middle of the night; eight hours later, postal inspector verified with local mail carriers when they reported to work that sender and recipient names were not associated with the addresses on the package; and postal inspector thereafter called in K-9). The Eighth Circuit has noted that "[w]here investigators have acted with reasonable diligence, courts have found acceptable the detention of mail for anywhere from twenty-nine hours to five days." *Lakoskey*, 462 F.3d at 977 (quoting *United States v. Ramirez*, 342 F.3d 1210, 1212 (10th Cir. 2003)).

Here, I find that Inspector Brandt acted with reasonable diligence in conducting his investigation. Inspector Brandt established reasonable suspicion to seize the package while it was transported by plane from California to Sioux Falls on Thursday, October

---

[10] Defense counsel agreed at the suppression hearing that the relevant determination is between the seizure of the package and when the drug-dog sniff established probable cause (as opposed to when the search of the package occurred), which is supported by Eighth Circuit caselaw. *See United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015) (examining delay between initial seizure and positive drug-dog alert, not delay between initial seizure and when the package was opened pursuant to a warrant); *Lakoskey*, 462 F.3d at 970-71, 977 (same); *see also Gomez*, 312 F.3d at 925-26 (addressing delay between seizure and determination of probable cause, as well as delay before issuance of search warrant). In any event, I find the additional one-day detention between the positive K-9 alert and the signing and execution of the search warrant did not render the seizure unreasonable under the Fourth Amendment.

31, 2019. The package traveled by truck as scheduled from Sioux Falls to Sioux City on Friday, November 1, 2019, at which point it was diverted to Urbandale by the Sioux City postal workers on Inspector Brandt's instructions. On Saturday, November 2, the package traveled to Des Moines; on Sunday, November 3, nothing happened; on Monday, November 4, the package arrived at Inspector Brandt's office in Urbandale around midday, and he contacted the Des Moines Police Department to arrange for a K-9 sniff of the package; and on Tuesday, November 5, at a little past 2:00 p.m., the drug-dog sniff occurred, resulting in a positive alert. Inspector Brandt testified that his territory as a Postal Inspector covers roughly the western half of the state of Iowa. He further testified that only a Postal Inspector can remove a package from the stream of mail—and since no Postal Inspector works in Sioux City (which is his territory), and the Postal Inspector in Sioux Falls is currently deployed, there were logistical problems with conducting a drug-dog sniff in Sioux Falls or Sioux City (despite those cities employing K-9 officers), since any sniff would have had to have occurred without removing the package from the stream of mail. He also testified that most mail is not delivered on Sundays, and postal workers would have had to come in on their day off to effect the package's transport on Sunday. Considering Inspector Brandt's explanation for the delay, I find that the four-day delay between the package's seizure and the positive drug-dog alert was reasonable. *See Pitts*, 322 F.3d at 451-53 (upholding under *Leon* five-day delay between seizure and issuance of search warrant when upon package's arrival in its destination city on a Friday, it was diverted to Des Moines, where the postal inspector worked; the postal inspector received the package the next day, a Saturday, and contacted numerous agencies about a K-9 sniff that weekend, to no success; a K-9 sniff occurred on Monday and was negative; and prior to the receipt of the search warrant on Wednesday, the postal inspector conducted further investigation by attempting to deliver the package and contacting recipient of package); ***United States v. Gill****,* 280 F.3d 923, 925-27, 929 (9th Cir. 2002) (upholding length of seizure when package was mailed late on a Thursday, and officer forwarded the package overnight to another officer who

15

worked near the package's destination; that officer received the package on Friday, conducted further investigation, and sent a search warrant to the Assistant United States Attorney (AUSA); the AUSA reviewed the search warrant over the weekend and urged the officer to continue his investigation; the officer completed a search warrant on Tuesday after talking with the local mail carrier for the recipient and calling the recipient's listed phone number; and a magistrate judge signed the warrant on Wednesday); *United States v. Aldaz*, 921 F.2d 227, 228-29, 231 (9th Cir. 1990) (upholding length of seizure as reasonable when package was mailed on October 8 from a small town in Alaska inaccessible by road, and the Postal Inspector directed the package's diversion to Anchorage, where he worked; the package did not arrive in Anchorage until the late afternoon of October 13 due to the intervening weekend day, federal holiday, and a flight cancellation; and the postal inspector contacted a K-9 officer when he received the package, who was unavailable until the next morning). Yodprasit does not cite any cases in which a court found the seizure of a package based on reasonable suspicion became unreasonable due to delay. I recommend finding that the seizure of the package, including its length, was reasonable.

### III. CONCLUSION

I respectfully recommend **denying** the motion to suppress (Doc. 25).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. **LCrR 59**. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* **Fed. R. Crim. P. 59**. Failure to object to the Report

and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

DATED this 12th day of February, 2020.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa